Gerald Barrett (SB#: 005855)
WARD, KEENAN & BARRETT, P.C.
3838 N. Central Avenue, Suite 1720
Phoenix, AZ 85012
Tel:  602-279-1717
Fax: 602-279-8908
Email: gbarrett@wardkeenanbarrett.com

LEVI & KORSINSKY, LLP
Joseph Levi, Esq. *Pro Hac Vice application pending*
William Scott Holleman, Esq. *Pro Hac Vice application pending*
30 Broad Street, 15th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
*Attorneys forPlaintiff*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| RON CLAYTON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DAVID ENGERT, DAVID BROPHY, PETER CHUNG, CHARLES BLAND, JEFF TERRILL, NIGHTHAWK RADIOLOGY HOLDINGS, INC., VIRTUAL RADIOLOGIC CORPORATION, and EAGLE MERGER SUB CORPORATION,<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW BREACH OF FIDUCIARY DUTIES |

Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

1. Plaintiff brings this action on behalf of the public stockholders of NightHawk Radiology Holdings, Inc. ("NightHawk" or the "Company") against NightHawk and its Board of Directors (the "Board") seeking equitable relief for their violations of violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9"), breaches of

fiduciary duty, and other violations of state law arising of their attempt to sell the Company to Virtual Radiologic Corporation and Eagle Merger Sub Corporation (collectively "Virtual Radiologic") by means of an unfair process and for an unfair price of $6.50 in cash for each share of NightHawk common stock (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $170 million.

2. The Proposed Transaction as currently constituted is unfair to the Company's shareholders because it does not adequately value the Company's future growth prospects, which will inure to Virtual Radiologic if the Proposed Transaction is consummated. In addition, on October 7, 2010, the Company filed a Schedule 14A Proxy Statement (the "Proxy") with the SEC in connection with the Proposed Transaction. The Proxy fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Rule 14a-9. This court has jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

4. Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District. In addition, NightHawk maintains its principal executive offices in Arizona.

**PARTIES**

5. Plaintiff is, and has been at all relevant times, the owner of shares of common stock of NightHawk.

6. NightHawk is a corporation organized and existing under the laws of the State of Delaware. It maintains its principal corporate offices at 4900 N. Scottsdale Road, 6th Floor, Scottsdale, Arizona 85251, and is leading the transformation of the

practice of radiology by providing high-quality, cost-effective solutions to radiology groups and hospitals throughout the United States.

7. Defendant David Engert ("Engert") has been the President, Chief Executive Officer, and a director of the Company since 2008.

8. Defendant David Brophy ("Brophy") has been a director of the Company since 2004.

9. Defendant Peter Chung ("Chung") has been a director of the Company since 2004.

10. Defendant Charles Bland ("Bland") has been a director of the Company since 2007.

11. Defendant Jeff Terrill ("Terrill") has been a director of the Company since 2009.

12. Defendants referenced in ¶¶ 7 through 11 are collectively referred to as Individual Defendants and/or the Board. The Individual Defendants as officers and/or directors of NightHawk, have a fiduciary relationship with Plaintiff and other public shareholders of NightHawk and owe them the highest obligations of good faith, fair dealing, loyalty and due care.

13. Defendant Virtual Radiologic Corporation is a Delaware corporation and is a privately owned national radiology practice working in partnership with local radiologists and hospitals to optimize radiology's pivotal role in patient care.

14. Defendant Eagle Merger Sub Corporation is a Delaware corporation wholly owned by Virtual Radiologic Corporation that was created for the purposes of effectuating the Proposed Transaction.

### INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

15. By reason of the Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of NightHawk and owe them, as well as the Company, a duty of highest good faith, loyalty and full, candid and adequate disclosure.

16. Where the officers and/or directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; (ii) a break up of the corporation's assets; or (iii) sale of the corporation, the Directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium. To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a) adversely affects the value provided to the corporation's shareholders;

(b) favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c) contractually prohibits them from complying with their fiduciary duties;

(d) will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e) will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

17. In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a) participating in any transaction where the Individual Defendants' loyalties are divided;

(b) participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c) unjustly enriching themselves at the expense or to the detriment of the public shareholders.

18. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty and good faith owed to Plaintiff and other public shareholders of NightHawk, or are aiding and abetting others in violating those duties.

19. Defendants also owe the Company's stockholders a duty of candor, which includes the disclosure of all material facts concerning the Proposed Transaction and, particularly, the fairness of the price offered for the stockholders' equity interest. Defendants are knowingly or recklessly breaching their fiduciary duties of candor by failing to disclose all material information concerning the Proposed Transaction, and/or aiding and abetting other Defendants' breaches.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

20. In committing the wrongful acts alleged herein, each of the Defendants has pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

21. During all relevant times hereto, the Defendants, and each of them, initiated a course of conduct which was designed to and did: (i) permit Virtual Radiologic to attempt to eliminate the public shareholders' equity interest in NightHawk pursuant to a defective sales process, and (ii) permit Virtual Radiologic to buy the Company for an unfair price. In furtherance of this plan, conspiracy and course of conduct, Defendants, and each of them, took the actions as set forth herein.

22. Each of the Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the

5

accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing. The Defendants' acts of aiding and abetting included, *inter alia*, the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## CLASS ACTION ALLEGATIONS

23. Plaintiff brings this action on its own behalf and as a class action on behalf of all owners of NightHawk common stock and their successors in interest, except Defendants and their affiliates (the "Class").

24. This action is properly maintainable as a class action for the following reasons:

    (a) the Class is so numerous that joinder of all members is impracticable. As of October 5, 2010, NightHawk has approximately 23.74 million shares outstanding.

    (b) questions of law and fact are common to the Class, including, inter alia, the following:

        (i) Have the Individual Defendants misrepresented and omitted material facts in violation of Section 14(a) of the Exchange Act;

        (ii) Have the Individual Defendants breached their fiduciary duties owed by them to Plaintiff and the others members of the Class;

        (iii) Are the Individual Defendants, in connection with the Proposed Transaction, pursuing a course of conduct that does not maximize NightHawk's value in violation of their fiduciary duties;

        (iv) Have the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

        (v)     Have NightHawk and Virtual Radiologic aided and abetted the Individual Defendants' breaches of fiduciary duty; and

        (vi)    Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

FURTHER SUBSTANTIVE ALLEGATIONS

*Company Background and its Poise for Growth*

25.    NightHawk is leading the transformation of the practice of radiology by providing high-quality, cost-effective solutions to radiology groups and hospitals throughout the United States. NightHawk's team of independent contractors, American Board of Radiology-certified, state-licensed and hospital-privileged physicians, provides professional services ("interpretations", "exams", "scans" or "reads") 24 hours per day, seven days a week, for approximately 26% of all U.S. hospitals. The reads provided by the Company consist primarily of off-hours preliminary reads, but also include final and sub-specialty interpretations. In addition to these professional services, the Company also provides their customers with cardiac 3D reconstructions, radiology clinical workflow

1 technology, and business services, all designed to enhance the care they provide to patients and improve the efficiency of their practices.

26. While the Company's professional services have historically consisted of preliminary reads, the Company growth strategy recently has been to sell new services, including final interpretations to its existing customers. By focusing more on final reads, the Company has performed very well recently and is poised for even more growth.

27. On May 6, 2010, the Company issued a press release announcing its financial results for the first quarter of 2010. The Company reported revenues of $36.5 million. The Company reported that final scan volumes increased 43% and that final read revenue increased $0.7 million from the same quarter in 2009. Commenting on the solid quarter, Defendant Engert stated: "The solid quarterly results reflected good growth in preliminary volumes and robust growth in finals volumes."

28. The Company's success in increasing its finals business continued into the second quarter of 2010. On August 5, 2010, the Company issued a press release announcing its financial results for the second quarter. For the quarter, NightHawk reported revenues of $38.8 million, above the Company's guidance range of $37.5 million to $38.5 million. The Company also reported adjusted net income of $2.5 million, or $0.10 per diluted share, which exceeded the company's guidance range of $0.06 to $0.07 cents per diluted share. In addition, final scan volumes increased 37% from the same quarter in 2009 and final read revenue increased by $0.5 million.

29. In the press release announcing the financial results, Defendant Engert commented on the Company's solid quarter and promising future expectations stating: "We are pleased to report that our total revenue and adjusted EPS were above our guidance range as demand for our services remained solid and as we began to see benefits from our cost reduction efforts. Looking ahead, we are focused on new opportunities to service and collaborate with our customers to help them meet their evolving needs in today's complex marketplace."

8

1       30.     In an August 5, 2010 conference call discussing the financial results, Engert noted the promising growth of the Company's final scan volume stating: "An encouraging sign…was that our final's volume continue to grow 37% year-over-year, which represents our most significant growth opportunity, " and that the Company was "excited about our newly developed growth strategy to participate with our customers in the broader finals market."  Moreover, in the same conference call, Engert commented on the Company's recent efforts, including among other things, operational efficiencies, that according to Engert will "continue to improve our financials in Q3 and Q4 of this year and a full year impact will be realized in 2011."

        31.     Further, in the August 5, 2010 conference call, Engert also discussed two new markets that the Company would be actively pursuing, which as stated by Engert, the Company is "poised" to benefit from. As stated by Engert in the conference call:

> In addition, there are two other markets we are actively pursing that I would like to talk briefly about. Last year, together with our physicians we developed what we believe to be the most advanced QA program ever to be introduced into radiology.
>
> We will now be launching this QA program as a service to our customers and non-customers alike. This program will provide a best-of-breed third-party solution to address the sensitive and complicated internal peer review process that Rad groups perform internally in reviewing the quality of their radiologist.
>
> We believe that this QA program will be transformative to the industry and change the way that quality will be measured in the future. Second, we are actively pursuing the multibillion dollar clinical trials market and we have uncovered some very promising opportunities
>
> With our breadth of high quality and some specialized physicians and further improvements in our operations, *we are poised to benefit in our existing core business as well as in these new emerging market opportunities*. [Emphasis Added].

        32.     Despite its recent strong performance and poise for growth, the Company agreed to enter into the Proposed Transaction.  In a press release dated September 27, 2010, the Company announced that it had entered into a merger agreement with Virtual

Radiologic pursuant to which Virtual Radiologic will acquire all of the outstanding shares of NightHawk for $6.50 per share. The press release stated in part:

> Eden Prairie, Minn. and Scottsdale, Ariz., September 27, 2010 – Virtual Radiologic (vRad), a national radiology practice and leader in the development of radiologist workflow technology, and NightHawk Radiology (NASDAQ: NHWK), a leading provider of radiology solutions to radiology groups across the United States, today announced that they have entered into a definitive agreement under which vRad will acquire all of the outstanding common stock of NightHawk Radiology Holdings, Inc. for $6.50 per share in cash….
>
> * * *
>
> The combination of vRad and NightHawk will result in enhanced services to radiology groups and hospitals across the country, accelerating vRad's stated commitment to optimize radiology's critical role in the delivery of patient care. The combined entity will have 325 radiologists serving nearly 2,700 healthcare facilities across all 50 states and reading approximately 6 million studies annually. Additionally, more than 75 percent of the affiliated radiologists will be fellowship-trained subspecialists.
>
> "Local radiology practices and hospitals are under intense pressure to deliver the highest quality care in the most efficient manner possible," said vRad President and Chief Executive Officer Rob Kill. "The need for expanded access, improved quality, and reduced costs is clear. Both vRad and NightHawk have been delivering these benefits in partnership with local radiologists for many years. This combination – which brings together both companies' talented team members and affiliated radiologists – will expand access to much-needed subspecialty expertise, helping to improve the quality of patient care across the United States. We look forward to working with NightHawk's talented team to deliver the highest quality radiology service in the country."

33. Upon the completion of the Proposed Transaction, Defendant Engert will remain as a Board Advisor. In addition, the remainder of the leadership team will be drawn from the management teams of both companies.

***The Unfair Price and Preclusive Deal Protection Provisions***

34. Given the Company's recent performance and future prospects, the consideration shareholders are to receive is inadequate. NightHawk shareholders are

10

1  being cashed out at the unfairly low price of $6.50 per share, which doesn't adequately
2  take into account the tremendous growth potential for NightHawk, including the potential
3  in their growing finals business. Moreover, as recently as November 2009, NightHawk's
4  traded at $7.50 per share, which is well above the Proposed Transaction price. Virtual
5  Radiologic is picking up NightHawk at the most opportune time, at a time when
6  NightHawk is poised for growth and its stock price is trading at a huge discount to its
7  intrinsic value.

8      35. Moreover, the *Comparable Company Analysis* conducted by Morgan
9  Stanley & Co. Incorporated ("Morgan Stanley"), the Company's financial advisor,
10 yielded a value of NightHawk as high as $8.24 per share.

11     36. In addition, on September 27, 2010, the Company filed a Form 8-K with
12 the U.S. Securities and Exchange Commission ("SEC") wherein it disclosed the
13 operating Agreement and Plan of Merger for the Proposed Transaction (the "Merger
14 Agreement"). As part of the Merger Agreement, Defendants agreed to certain onerous
15 and preclusive deal protection devices that operate conjunctively to make the Proposed
16 Transaction a *fait accompli* and ensure that no competing offers will emerge for the
17 Company.

18     37. By way of example, § 5.10(a) of the Merger Agreement permits the
19 Company to solicit competing acquisition proposals for a mere 30 days following signing
20 of the Merger Agreement. Thereafter, pursuant § 5.10(b) of the Merger Agreement, a
21 strict "no solicitation" provision kicks in and the Company must immediately cease
22 soliciting potential acquirers and must cease any discussion and negotiations with
23 potential bidders. The Company may continue discussions and negotiations only with a
24 party that has made an acquisition proposal that the Board "determines in good faith,
25 after consultation with its independent financial advisor and outside legal counsel,
26 constitutes a Superior Proposal, or would reasonably likely lead to a Superior Proposal."

27     38. Pursuant to § 5.10 of the Merger Agreement, should a competing bidder
28 arrive on the scene, the Company must notify Virtual Radiologic of the bidder's offer.

1  Thereafter, should the Board determine that the unsolicited offer is superior, Virtual
2  Radiologic is granted four business days to amend the terms of the Merger Agreement to
3  make a counter-offer so that the competing no longer constitutes a superior proposal.
4  Virtual Radiologic is able to match the competing offer because it is granted unfettered
5  access to the unsolicited offer, in its entirety, eliminating any leverage that the Company
6  has in receiving the unsolicited offer.

7      39.   In other words, the Merger Agreement gives Virtual Radiologic access to
8  any rival bidder's information and allows Virtual Radiologic a free right to top any
9  superior offer.  Accordingly, no rival bidder is likely to emerge and act as a stalking
10 horse, because the Merger Agreement unfairly assures that any "auction" will favor
11 Virtual Radiologic and piggy-back upon the due diligence of the foreclosed second
12 bidder.

13     40.   In addition, the Merger Agreement provides that a termination fee of
14 $6,600,000 (or $ 3,700,000 if the superior proposal resulted from the go-shop period)
15 must be paid to Virtual Radiologic by NightHawk if the Company decides to pursue said
16 other offer, thereby essentially requiring that the alternate bidder agree to pay a naked
17 premium for the right to provide the shareholders with a superior offer.

18 *Financial Benefits Received by the Individual Defendants*

19     41.   Moreover, despite their duty to maximize shareholder value, certain of the
20 Individual Defendants have clear and material conflicts of interest and are acting to better
21 their own interests at the expense of NightHawks's public shareholders.

22     42.   For example, each of the Individual Defendants currently hold restricted
23 stock of NightHawk that, upon consummation of the Proposed Transaction, will no
24 longer be subject to the restrictions and will be converted into a right to receive $6.50 per
25 share.  Upon consummation of the Proposed Transaction, Defendant Engert will receive
26 $715,000, Defendants Bland, Chung, and Brohpy will each receive $403,657, and
27 Defendant Terrill will receive $364,137 by cashing out their previously restricted shares.
28

43. In addition, Defendant Engert has an employment agreement with the Company pursuant to which if he is terminated without cause or resigns for good reason following consummation of the Proposed Transaction, he will receive severance payments of $466,000.

44. Based on the aforementioned, the Proposed Transaction is wrongful, unfair and harmful to NightHawks's public shareholders, and represents an effort by Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members. The Proposed Transaction is an attempt to deny Plaintiffs and the other members of the Class their rights while usurping the same for the benefit of defendants on unfair terms.

***The Materially Misleading and Incomplete Proxy Statement***

45. On October 7, 2010, the Company filed the Proxy with the SEC in connection with the Proposed Transaction. The Proxy fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction.

46. For example, the Proxy fails to disclose the underlying methodologies, key inputs, and multiples relied upon and observed by Morgan Stanley, the Company's financial advisor, so that shareholders can properly assess the credibility of the various analyses performed by Morgan Stanley and relied upon by the Board in recommending the Proposed Transaction.

47. With respect to the *Discounted Cash Flow Analysis*, the Proxy fails to disclose (a) the calculations used by Morgan Stanley to derive the Company's free cash flows for years 2010 through 2015, as well as the free cash flow projections for each year; (b) the key inputs used by Morgan Stanley to calculate the Company's weighted average cost of capita including betas, risk premiums, and assumed capital structure; and (c) the criteria used by Morgan Stanley to select a perpetuity growth rate of 2.00% to 3.00%.

1   48. With respect to the *Comparable Company Analysis*, the Proxy fails to disclose: (a) the criteria used by Morgan Stanley to determine which companies were similar to the Company and were selected to be used in the analysis; (b) the multiples observed for each company; and (c) the criteria used to select the reference ranges that were applied to the Company's financial statistics in the analysis.

49. With respect to the *Analysis of Selected Precedent Transactions*, the Proxy should disclose the reasons only one transaction (the Virtual Radiologic/Providence transaction) was selected to be used in the analysis and the reasons that specific transaction was selected. In addition, the Proxy should disclose the source of the 2011 EBITDA projections for the Virtual Radiologic/Providence transaction.

50. With respect to the *Leveraged Buyout Analysis*, the Proxy fails to disclose the criteria and/or calculations made by Morgan Stanley to select leverage ratios of 4.0x to 5.0x, an interest rate on the buyer's debt of 9%, and an internal rate of return of between 15.0% and 25.0%. The Proxy also fails to disclose the transactions used in the premiums paid analysis, the date of each transaction, and the premiums observed for each transaction.

51. Further, the Proxy omits material information regarding the financial advisor retained in connection with the Proposed Transaction. Specifically, the Proxy states that in the past two years Morgan Stanley "has provided financial advisory services and financing services to the Company and affiliates of Providence" but fails to disclose the specific nature of the services provided and the amount of compensation received for such services. In addition, the Proxy states that "Morgan Stanley and its affiliates, directors or officers, including individuals working with the Company in connection with the merger, may have committed and may commit in the future to invest in private equity funds managed by affiliates of Providence," but fails to disclose the terms of such investments and the specific individuals involved.

52. In addition, the Proxy fails to disclose material information concerning the events leading up to the Proposed Transaction as well as the post-signing go-shop period.

1  In particular, the Proxy fails to disclose the criteria used to select the 10 buyers contacted
2  by Morgan Stanley in 2008, as well as how many parties were strategic and how many
3  parties were financial; whether the Company received any indications of interest to
4  purchase the Company during the 2008 sales process, and if it did receive indications of
5  interest to disclose the value of such offers;  the reasons the Company determined to
6  engage in negotiations with Virtual Radiologic beginning in June 2010 considering there
7  was no indication the Company was for sale at that point; and how many parties were
8  contacted during the go-shop period, the criteria used to select such parties including how
9  many were strategic and how many were financial, and the results of the discussions with
10 such parties.

11     53.    It is absolutely necessary for shareholders to receive a Proxy that provides
12 all material disclosures related to the sales process in order for shareholders to be able to
13 cast a fully informed decision regarding the Proposed Transaction.

14     54.    Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent
15 the irreparable injury that Company shareholders will continue to suffer absent judicial
16 intervention.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violations of Section 14(a) of the Exchange Act**
**and Rule 14a-9 Promulgated Thereunder**

21     55.    Plaintiff repeats all previous allegations as if set forth in full herein.

22     56.    Defendants have issued the Proxy with the intention of soliciting
23 shareholder support of the Proposed Transaction.

24     57.    Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange
25 Act provides that a proxy statement shall not contain "any statement which, at the time
26 and in the light of the circumstances under which it is made, is false or misleading with
27 respect to any material fact, or which omits to state any material fact necessary in order to
28 make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

58. Specifically, the Proxy violates the Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

59. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT II
### Breach of Fiduciary Duty – Failure to Maximize Shareholder Value
### (Against All Individual Defendants)

60. Plaintiff repeats all previous allegations as if set forth in full herein.

61. As Directors of NightHawk, the Individual Defendants stand in a fiduciary relationship to Plaintiff and the other public stockholders of the Company and owe them the highest fiduciary obligations of loyalty and care. The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Company which imposes heightened fiduciary responsibilities to maximize NightHawk's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

62. As discussed herein, the Individual Defendants have breached their fiduciary duties to NightHawk shareholders by failing to engage in an honest and fair sale process.

63. As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of NightHawk's assets and will be prevented from benefiting from a value-maximizing transaction.

64. Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

16

65. Plaintiff and the Class have no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duty—Disclosure
### (Against Individual Defendants)

66. Plaintiff repeats all previous allegations as if set forth in full herein.

67. The fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting NightHawk's shareholders.

68. As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

69. As a result, Plaintiff and the Class members are being harmed irreparably.

70. Plaintiff and the Class have no adequate remedy at law.

## COUNT IV

### AIDING AND ABETTING
### (Against NightHawk and Virtual Radiologic)

71. Plaintiff repeats all previous allegations as if set forth in full herein.

72. As alleged in more detail above, NightHawk and Virtual Radiologic are well aware that the Individual Defendants have not sought to obtain the best available transaction for the Company's public shareholders. Defendants NightHawk and Virtual Radiologic aided and abetted the Individual Defendants' breaches of fiduciary duties.

73. As a result, Plaintiff and the Class members are being harmed.

74. Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly and severally, as follows:

(A) declaring this action to be a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

17

1  (B) declaring that the Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(C) enjoining, preliminarily and permanently, the Proposed Transaction;

(D) in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E) directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(F) awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G) granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

Dated this 22nd day of October, 2010.

S/GERALD BARRETT
Gerald Barrett (SB#: 005855)
WARD, KEENAN & BARRETT, P.C.
3838 N. Central Avenue, Suite 1720
Phoenix, AZ 85012
Tel:  602-279-1717
Fax: 602-279-8908
Email: gbarrett@wardkeenanbarrett.com
Attorneys forPlaintiff


LEVI & KORSINSKY, LLP

Joseph Levi, Esq. *Pro Hac Vice application pending*
William Scott Holleman, Esq. *Pro Hac Vice application pending*
30 Broad Street, 15th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171